| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
|---|---|
| EASTERN DISTRICT OF NEW YORK | |

JOHN L. McGHEE,

                Petitioner,

     – against –

DAVID A. ROCK,

                Respondent.

**MEMORANDUM & ORDER**

12-CV-4077 (ERK)

KORMAN, *J.*:

On August 15, 2001, victim Edgar Garzon was assaulted while walking down the street in Jackson Heights, Queens. (Trial Tr. at 347.) He died in the hospital three weeks later. (*See id.* at 689.) In December 2001, petitioner John McGhee moved to England and upon returning to the United States in 2006 was tried for Garzon's murder. (*See id.* at 816.) McGhee's first trial ended in a mistrial due to a juror's illness that prevented deliberations. (Proceedings July 24, 2007 at 2-3.)

At McGhee's second trial, the government called 10 witnesses. Emergency responders testified that gray brain matter was discharging from the victim's skull upon arrival. (Trial Tr. at 321.) A local resident testified that the assailant smashed the victim's head into the sidewalk with such force that sharp whacking sounds could be heard inside a nearby apartment building. (*Id.* at 612.) The victim's friend testified that immediately after the beating, the victim was lying in a pool of blood and was convulsing such that his head repeatedly struck the ground. (*Id.* at 383.) While neither the local resident nor the victim's friend saw the assailant's face, both stated that at least two men other than the victim were present at the scene: the assailant and a friend of the assailant who at one point instructed the assailant to stop the assault. (*Id.* at 428, 615.) The

local resident and the victim's friend also recalled that once the assault ended, the assailant took the driver's seat in a red car and the assailant's friend took the front passenger seat; the car then drove away after jerking several times. (*Id.* at 382, 616.)

The government's key witness was Christopher Ricalde, who was 14 years old at the time of the crime. He testified that on August 15, 2001 he was in the back seat of a red car driven by petitioner John McGhee. (*Id.* at 446.) He claimed that he saw McGhee step out of the car and beat a man to the ground. (*Id.* at 452.) He also testified that his co-passenger eventually stepped out from the front passenger seat and instructed McGhee to stop the assault. (*Id.* at 466.) Much of Ricalde's testimony was consistent with that of the local resident and the victim's friend—for example, all three claimed the car jerked before it drove away; all claimed that the events occurred at the same location and around the same general time. (*Id.* at 377, 455, 448, 611.) But several subtle inconsistencies are apparent. Whereas Ricalde claimed that the victim stood up and walked away after the assault, (*id.* at 454), the victim's friend claimed that the victim was totally unable to stand up, not even "half way," (*id.* at 431-32). Ricalde testified that his co-passenger was African American with braided hair, (*id.* at 457), but the local resident testified that the co-passenger was a light skinned Hispanic with no braids, (*id.* at 624-25). Similarly, the local resident claimed that the assailant was a light skinned Hispanic with dark hair, (*id.* at 613), but Ricalde claimed that the assailant was McGhee, a bald man who "we can all agree is not a light skinned Hispanic,"[1] (*id.* at 453, 817). There was also much confusion about whether the assault involved a weapon—the victim's friend told a 911 operator that there was a baseball bat,

---

[1] The record is unclear as to McGhee's race, but McGhee's counsel stated during summation that "we can all agree [that] John McGhee is not a light skinned Hispanic." The prosecution did not object. (Trial Tr. at 845.)

2

(*id.* at 433-34); the local resident recalled seeing a small object in the assailant's hand, (*id.* at 630); but Ricalde's testimony did not mention an object of any sort, (*id.* at 453).

During cross examination of Ricalde, he admitted to being a member of gang known as the Latin Kings. (*Id.* at 495.) He also admitted to smoking marijuana on a daily basis between the ages of 12 and 14, including on the night of the assault. (*Id.* at 447, 471, 496.) He admitted to other criminal acts as well, such as vandalizing a car and conducting a fraud related to his sister's bank account. (*Id.* at 855.) McGhee's counsel repeatedly compared Ricalde's testimony in the second trial to his testimony from the first trial—it becomes clear that Ricalde's story is inconsistent regarding many of the details from August 15, 2001. (*See, e.g.*, 491.) It is also clear that Ricalde had lied to the police on multiple occasions—for example, Ricalde initially informed police that he was not at the scene of the crime, but in subsequent police interviews he claimed being present in the car. (*Id.* at 482.) Raising further suspicion as to the truth of Ricalde's testimony, McGhee's counsel highlighted that police posters offered a reward for information regarding the assault, but Ricalde claimed that while he definitely saw the posters, he never noticed the large printed words "$12,000 reward." (*Id.* at 493.)

Among the last witnesses that the District Attorney called were Detective Corey and Dr. Lara Goldfeder, a doctor in New York City's Office of the Medical Examiner. Detective Corey testified that he came to believe that McGhee was associated with the victim's murder based on information that Ricalde provided between 2003 and 2006. (*Id.* at 562-63.) He also testified that although McGhee had been living in England since late 2001, McGhee returned to the United States in 2006 because he lied on his application for British citizenship and the British authorities had asked him to leave. (*Id.* at 566, 575.) Detective Corey stated that he met McGhee at the

3

airport just after his flight from England landed. After Corey introducing himself as a detective, McGhee replied, "What do you think I am looking at, three, four, five years?" (*Id.* at 567.)

Dr. Goldfeder testified that before beginning her autopsy to determine the victim's cause of death she reviewed his medical records, which indicated injuries to the victim's head, including severe lacerations and fractures. (*Id.* at 685.) The medical records also indicated that physicians other than Dr. Goldfeder performed treatments on the victim between the time of the assault and the time of death, including placement of a catheter through his skull and removal of portions of his skull and brain. At some points, Dr. Goldfeder briefly explained the purpose behind some of the treatments performed by physicians other than herself. For example, physicians used the catheter to monitor brain swelling—when swelling "reach[es] a critical point . . . they can treat it []surgically." (*Id.* at 688-89.) She stated that reviewing the treatments performed by other physicians was critical to her cause of death determination. Without reviewing the victim's records, it would be difficult to determine whether certain abnormalities resulted from blows to the head as opposed to medical intervention or a pre-existing congenital defect from which the victim suffered. (*See id.* at 690, 697.)

After discussing the victim's records, Dr. Goldfeder described her actual autopsy, including her need to store the victim's brain in a formaldehyde solution due to its softened state. (*Id.* at 694.) She described in great detail all the fractures on the victim's skull, including a description of the victim's pre-existing congenital defect which consisted of a "thin" skull near the back of the victim's head. She ultimately stated that forceful "blunt trauma" caused the death and that the victim's pre-existing defect played no role. (*Id.* at 714.) On cross examination, McGhee's attorney briefly inquired into the possibility of medical intervention or congenital defect as a cause of death, but Dr. Goldfeder rebuffed these suggestions. (*Id.* at 719, 725.)

At the close of the prosecution's case, the trial judge denied McGhee's motion to dismiss for insufficiency of the evidence. (*Id.* at 745.) Although he himself did not testify, McGhee then presented a defense consisting of 3 witnesses: a car expert, a reputation witness, and McGhee's wife. The car expert testified that the red car seen at the crime scene was a red Acura Integra, and specifically not a red Honda CRX. (*Id.* at 758.) This was relevant in that the prosecution's witness, Christopher Ricalde, testified that the red car was a Honda CRX. (*Id.* at 446.) McGhee's reputation witness was Barry Ricalde, Christopher Ricalde's father. The father testified that his son's reputation for truth and veracity was "exceedingly bad," that his son enjoyed being the center of attention, and that the father had told his son to not testify or speak to the police regarding the son's "lies" and fabrications. (*Id.* at 779, 797.) McGhee's wife testified that McGhee moved to England not as a fugitive but in an effort to rebuild a family with his wife and children, all of whom were British citizens living in England. (*Id.* at 815-16.) On cross examination, presumably for purposes of impeachment, the prosecutor elicited that McGhee's wife co-signed McGhee's application for British citizenship despite knowing that it contained a lie. (*Id.* at 829.)

After deliberating and hearing read backs from the testimony of Christopher Ricalde, Decective Corey, and the local resident, the jury found McGhee guilty of second-degree murder. (*Id.* at 930.) The trial judge denied McGhee's motion to set aside the verdict and imposed a sentence of 22 years to life. (Proceedings Oct. 17, 2008 at 2, 15.) On appeal, McGhee argued for reversal based on two evidentiary grounds—permitting the prosecutor to elicit testimony that McGhee lied on his application for British citizenship and prohibiting McGhee's lawyer from laying a foundation regarding Barry Ricalde's basis of knowledge for his son's poor reputation. Ruling that these grounds were without merit, the Appellate Division affirmed McGhee's

5

conviction. *People v. McGhee*, 82 A.D.3d 1264, 1265-66 (N.Y. App. Div. 2d Dep't 2011). The Court of Appeals denied leave to appeal. *See People v. McGhee*, 17 N.Y.3d 808, 808 (2011).

McGhee then filed § 440.10 and *coram nobis* motions. His § 440.10 motion claimed ineffective assistance of trial counsel based primarily on two grounds: failing to object to untrue testimony by Dr. Goldfeder and failing to retain an expert to respond to Dr. Goldfeder's findings regarding the victim's cause of death. The trial judge denied McGhee's § 440.10 motion because it lacked merit and because, in addition, it asserted on the record claims. (Decision & Order, Nov. 17, 2011, at 4-5). The Appellate Division denied leave to appeal. (*See* Aff. Opp'n Habeas Pet. at 12; Reply Br. Supp. Habeas Pet. at 1, ¶ 1.) McGhee's *coram nobis* motion argued that appellate counsel was ineffective for failing to raise issues regarding the prosecutor's improper vouching for witnesses. (Mot. Supp. Coram Nobis at 4-6.) The Appellate Division denied this motion on the merits, and the Court of Appeals denied leave to appeal. *People v. McGhee*, 93 A.D.3d 736, 736 (N.Y. App. Div. 2d Dep't 2012); *People v. McGhee*, 20 N.Y.3d 1013, 1013 (2013). McGhee's petition for a writ of habeas corpus asserts two grounds: (i) trial counsel's ineffectiveness for failing to object to Dr. Goldfeder's testimony and failing to consult a medical expert to respond to Dr. Goldfeder's testimony; and (ii) appellate counsel's ineffectiveness for failing to argue on direct appeal that the prosecutor improperly vouched for witnesses during summation. (Habeas Pet. at 4-5.)

## DISCUSSION

### I. *Ineffective Assistance of Trial Counsel*

McGhee asserts two specific instances of ineffective trial counsel: failure to "call or retain any defense experts to rebut the people's [medical] expert" and failure to "object to the medical examiner's uncontroverted expert testimony." (Habeas Pet. at 4.) The trial judge ruled

that these claims are meritless. To prove ineffective assistance of counsel under Supreme Court precedent, criminal defendants must show that (i) "counsel's representation fell below an objective standard of reasonableness" and that (ii) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 687-88 (1984). The first prong requires that courts recognize counsel's "wide latitude" in making tactical decision and imposes a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The second prong requires that defendants "show[] a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 694.

In *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011), the Supreme Court addressed the applicability of AEDPA deference as applied to claims of ineffective assistance of counsel under *Strickland v. Washington*, 566 U.S. at 687-88. Recognizing that AEDPA and *Strickland* are both "highly deferential" on their own, the Supreme Court observed that together they are "doubly so." *Harrington*, 131 S.Ct. at 788. Thus, the question is not "whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The trial judge did not unreasonably hold that McGhee's counsel was not ineffective. Indeed, the record reveals that trial counsel presented meaningful representation. At trial, counsel conducted an extremely damaging cross examination of Christopher Ricalde, eliciting that the witness was a gang member, a liar, and a habitual drug user. (*See, e.g.*, Trial Tr. at 471.) At McGhee's *Sandoval* and *Huntley* hearings, counsel displayed adeptness by presenting several persuasive arguments, all of which revealed familiarity with McGhee and the factual nuances of the case. (*See id.* at 9-12.) At voir dire, counsel actively engaged in jury selection and entered into a lengthy colloquy with the judge regarding prospective juror bias and the presumption of

innocence. (*Id.* at 45-46.) Other examples of effective advocacy are ample: counsel gave competent opening and closing statements; called witnesses on McGhee's behalf; objected to the government's overly prejudicial photographs; moved to dismiss for insufficiency of the evidence; and moved to set aside the jury's verdict. (*See, e.g.*, Trial Tr. at 608; Appellant Br. on Direct Appeal at 17-18.)

McGhee's first instance of alleged trial counsel error is based on a failure to obtain an expert to rebut Dr. Goldfeder's assertion that blunt force caused the victim's death. (Habeas Pet. at 4.) The Supreme Court dismissed a similar claim in *Harrington v. Richter*, 131 S.Ct. at 788. There, trial counsel failed to consult a blood expert while developing a defense. The Court ruled that this was not deficient performance under *Strickland* and that trial counsel is free to "avoid activities that appear 'distractive from more important duties.'" *Id.* at 789. The Court went on, "[e]ven if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it." *Id.* Indeed, "[t]here are countless ways for counsel to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 788-89.

Passing over the fact that McGhee has offered no basis for concluding that Dr. Goldfeder's finding were flawed, the record shows that the most obvious weakness in the prosecution's case against McGhee regarded whether McGhee beat the victim, not whether the victim died as a result of the beating. While some evidence vaguely suggested that medical intervention or the victim's pre-existing congenital defect may have contributed to his death, (*see, e.g.*, Trial Tr. at 719, 725), the record is overflowing with evidence indicating that the assault was the true cause: numerous witnesses testified that immediately after the assault the

8

victim was convulsing such that his head repeatedly and involuntarily struck against the concrete sidewalk, which was covered in the victim's blood and brain mater; one witness testified that the assailant slammed the victim's head into the sidewalk with such force that multiple sharp smacking sounds were heard inside a nearby building; surgeons were forced to remove parts of the victim's skull to provide room for his swollen brain; photographs show the victim in the hospital just after the beating with extreme bruises and cuts running across his face. (*See id.* at 318, 362-63, 625, 687.)

Nevertheless, counsel did effectively cross examine the medical examiner and in doing so introduced to the jury the notions of medical intervention and pre-existing congenital defect as a possible cause of death. (*Id.* at 719.) That counsel chose to not obtain an expert to rebut what may have been irrefutable evidence is not sufficient for a showing under *Strickland*. This is especially true where counsel's apparent strategy was to focus on whether McGhee beat the victim. (*Id.* 844-45.) On this issue, counsel put forth an excellent defense, which included testimony from McGhee's wife, a motor vehicle expert, and a reputation witness used to undermine the credibility of the prosecutor's key witness, Christopher Ricalde. (*See, e.g.*, 779-80.) Under these circumstances, the trial judge was not unreasonable in ruling that trial counsel's failure to retain a medical expert did not contravene *Strickland*'s performance prong.

McGhee's second specific instance of alleged trial counsel error is based on a "failure to object to the medical examiner's uncontroverted expert testimony based upon pre-trial and prior to trial, examinations by different medical physicians pertaining to examinations of the brain and skull." (Habeas Pet. at 4.) McGhee's position here is unclear, and I read it as a claim that the prejudicial effect of Dr. Goldfeder's testimony regarding other physicians' treatments outweighed its probative value.

9

Even assuming that Dr. Goldfeder's testimony was arguably prejudicial, the trial judge was not unreasonable in ruling that McGhee's trial counsel did not violate *Strickland*'s performance prong in failing to object on that ground. Indeed, trial counsel did object at some points during the government's direct examination of Dr. Goldfeder. And as stated earlier, throughout other parts of the trial counsel objected to the admission of overly prejudicial government photographs. (*See, e.g.*, *id.* at 364). This indicates that trial counsel's failure to object to Dr. Goldfeder's possibly prejudicial testimony "was driven by strategy" and thus cannot be called into question. *Allen v. Artus*, 09-cv-4562, WL 1918721, at *20 n.10 (E.D.N.Y. May 14, 2014) (collecting cases). There are many strategic reasons an attorney might "forego objections: the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences." *Taylor v. Fischer*, No. 05 Civ. 3034, WL 416372, at *6 (S.D.N.Y. Feb. 21, 2006).

Nor was it unreasonable that the trial judge determined that trial counsel's alleged errors did not satisfy *Strickland*'s second prong. First, there is no suggestion that the result of McGhee's trial reasonably might have been different had trial counsel objected to Dr. Goldfeder's testimony regarding treatments performed by other physicians. The jury had already heard a graphic description of the injuries suffered by the victim, and it is inconceivable that testimony regarding treatments performed by other physicians could possibly have affected the verdict. Indeed, indicating the jury's focus on the central issue of whether it was McGhee who assaulted the victim, during deliberations the jury asked only for read backs from the testimony of Christopher Ricalde, Detective Corey, and the local resident, each of which went to that issue. (Trial Tr. at 930.)

Second, McGhee's argument regarding the failure of counsel to call his own medical expert to respond to Dr. Goldfeder assumes, without any support from the record, that such an expert would have contradicted Dr. Goldfeder. Indeed, McGhee has put forth, at best, a mere "theoretical possibility" that the victim died from something other than the assault and has submitted nothing by way of "direct refutation of [Dr. Goldfeder's] testimony." *See Harrington*, 562 S.Ct. at 792. More significantly, and as discussed earlier, the central issue in the case was whether McGhee assaulted the victim, not whether the victim died from the assault.

## II. *Ineffective Assistance of Appellate Counsel*

Without pointing to any specific statements that the prosecutor made, McGhee argues here that appellate counsel was ineffective in not arguing for reversal based on the prosecutor's improper vouching for witnesses during summation.[2] (Habeas Pet. at 5.) The Appellate Division ruling that this claim is meritless is entitled to the standard of "double deference" outlined earlier. To show ineffective assistance of appellate counsel, defendant's must show that (i) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (ii) absent counsel's deficient performance, there is a reasonable probability that the appeal would have been successful. *See Strickland*, 466 U.S. at 687. Under the first prong, appellate counsel need not raise frivolous arguments on appeal. Nor should counsel "raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Indeed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker

---

[2] McGhee also seems to claim (for the first time in his reply brief here) that the prosecutor improperly attempted to "trip up" the defense's witnesses. (Reply Br. at 2.) McGhee points to nothing specific in the record and seems to suggest that traditional tactics used on cross examination would be constitutional error, such as asking a witness to explain certain details regarding his testimony on direct examination or confronting a witness with a contradiction made on direct examination. This unexhausted claim is meritless.

11

arguments on appeal and focusing on one central issue if possible or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

McGhee's appellate counsel provided meaningful representation. In the Appellate Division, he summarized the proceedings below clearly and in a light favorable to McGhee; made relevant citations to the record; argued for reversal based on two evidentiary grounds; and cited applicable case law indicating that he had fully researched the issues. (*See* Appellant's Br. on Direct Appeal.) Appellate Counsel also wrote an articulate and well-reasoned letter to Judge Ciparick on the Court of Appeals in which he urged the court to review the Appellate Division's ruling. (Letter May 26, 2011).

As for McGhee's specific assertion that appellate counsel failed to argue improper vouching on appeal, I have reviewed the prosecutor's summation and find no improper vouching. Vouching under New York law refers to the prosecutor acting as an unsworn witness in order to tie his own credibility to that of the witness. *See People v. Moye*, 12 N.Y.3d 743, 744 (2009) (citing *People v. Lovetlo*, 1 N.Y.2d 436, 439 (1956)). While the prosecutor provided a litany of reasons why the jury should believe Christopher Ricalde and disbelieve McGhee's reputation witness, this does not constitute improper vouching. The prosecutor referred to evidence properly before the court and, based on that evidence, speculated as to the witnesses' possible motives and interests, but he never put his own character or credibility at issue. *See Rodriquez v. Brown*, No. 11-cv-1246, WL 4073748, at *6 (E.D.N.Y. Sept. 13, 2011). Yes, on several occasions the prosecutor stated in substance, "I submit that Christopher Ricalde is telling the truth." (*See, e.g.*, Trial Tr. at 889.) But phrases like "I submit" or "I suggest" are not improper where the prosecutor argues based on evidence and not personal belief. *See Rodriquez*, 2011 WL 4073748, at *6. Such phrases are particularly inoffensive here, where the prosecutor

12

was responding to defense counsel's provocations regarding Christopher Ricalde's credibility. *See People v. Marks*, 6 N.Y.2d 67, 77 (1959).

In an affirmation responding to McGhee's *coram nobis* motion, McGhee's appellate attorney addressed the fact that no improper vouching occurred and further highlighted that any hypothetical improper vouching would have, in any event, been unpreserved for appellate review. (Aff. Resp. Coram Nobis at 3-4.) Under these circumstances, the Appellate Division was not unreasonable in rejecting McGhee's claim of ineffective appellate counsel.

### III. *Actual Innocence*

McGhee's reply brief summarizes much of the trial and asks that I grant habeas relief based on a "weight of the evidence analysis" and that I "weigh the relative probative force of conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony [at trial]." (Reply Br. at 2.) Reading this language generously, I construe this as a standalone claim of actual innocence and deny it on the merits. First, it is an open question whether there is a "constitutional right to be released upon proof of actual innocence." *Friedman v. Rehal*, 618 F.3d 142, 159 (2d Cir. 2010). Second, assuming there is that right, the evidence that McGhee presents here is not sufficient to meet "the high standard" that such a claim would require. *See District Attorney's Office v. Osborne*, 557 U.S. 52, 71 (2009). Indeed, McGhee does not present new evidence obtained after his trial; rather, he merely reasserts that Christopher Ricalde is untrustworthy and inconsistent as to some details regarding the events on August 15, 2001. Habeas corpus relief cannot be granted based on such evidence, as "[i]t is well settled that upon habeas corpus the court will not weigh the evidence." *Hyde v. Shine*, 199 U.S. 62, 84 (1905). Indeed, while Christopher Ricalde may have been an impaired witness, that by itself would not be sufficient to upset the verdict even on direct appeal. As the Supreme Court

13

has held, "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311 (1966).

## CONCLUSION

I deny the petition and decline to issue a certificate of appealability.

**SO ORDERED.**

Brooklyn, New York

November 7, 2014

*Edward R. Korman*

Edward R. Korman

Senior United States District Judge